United States District Court
Southern District of Texas
FILED

JUL 3 1 2021

Nathan Ochsner, Clerk

United States District Court
Southern District of Texas
**ENTERED**
August 02, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

JUAN ALBERTO MARTINEZ §
MORALES, §
 §
Petitioner, §
 §
VS. §   CIVIL ACTION NO. 7:21-CV-0020
 §
BOBBY LUMPKIN, Director, §
Texas Department of Criminal Justice, §
Correctional Institutions Division, §
 §
Respondent. §

## REPORT AND RECOMMENDATION

Petitioner JUAN ALBERTO MARTINEZ MORALES, a state prisoner proceeding pro se, initiated this action by filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). (Dkt. No. 1). Petitioner is serving life imprisonment following convictions by jury of two counts of injury to a child in the 93rd District Court of Hidalgo County, Texas. Now, seeking federal habeas review, Petitioner raises several claims for relief from the convictions, including claims of no evidence, ineffective assistance of counsel, and actual innocence.[1] (*See* Dkt. No. 1 at 6-7; *see also* Dkt. No. 1-1 at 15-21).

Respondent has since made an appearance and filed a Motion for Summary Judgment (the "Summary Judgment Motion") (Dkt. No. 10) together with an electronic copy of the state court

---

[1] In addition to the reversal of his convictions, Petitioner seeks $600,000 in damages. (Dkt. No. 1 at 7). "If a state prisoner is seeking damages, he is attacking something other than the fact or length of his confinement, and . . . habeas corpus is not an appropriate or available federal remedy." *Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973). To the extent Petitioner wishes to advance his damages claim, he must do so by filing a separate civil rights complaint pursuant to 42 U.S.C. § 1983 and either pay the $402 filing fee or submit an application to proceed in forma pauperis.

1 / 36

record (Dkt. No. 11).[2]   Respondent seeks the dismissal of the Petition on the grounds that Petitioner's claims are either procedurally barred, non-cognizable on federal habeas review, or otherwise without merit. (Dkt. No. 10 at 11-29). Petitioner has filed a response. (Dkt. No. 13).

This case was referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). After review of the record and relevant law, the undersigned respectfully RECOMMENDS that the Summary Judgment Motion (Dkt. No. 10) be GRANTED, that the Petition (Dkt. No. 1) be DENIED, and that this civil action be DISMISSED. The Magistrate Judge also RECOMMENDS that a Certificate of Appealability be DENIED.

## I. BACKGROUND

### A. Offense Conduct and Investigation

By way of background, Petitioner was convicted of beating and seriously injuring his three-month old twin daughters, A.M. and R.M.[3] *Morales Martinez v. State*, 2019 WL 2532432, at *1 (Tex. App.—Corpus Christi-Edinburg June 20, 2019, pet. ref'd) (mem. op).

On September 25, 2015, Anna Delia Mendez, an investigator with the Hidalgo County Sheriff's Office (the "Sheriff's Office"), was called to the Edinburg Children's Hospital to investigate a report of injury to a child. *Id.* at *1. Arriving at the hospital, Investigator Mendez observed that A.M., who was three-months old at the time, had bruising on her head and chest and a swollen right arm. *Id.* Investigator Mendez also observed bruising to R.M.'s body. *Id.* A.M. was eventually determined to have approximately thirty bone fractures in different stages of healing, while R.M. was determined to have approximately sixteen fractures in the same stages of healing. *Id.* A.M.'s injuries were deemed consistent with "non-accidental trauma." *See id.*

---

[2] Any citations to the state court record will refer to the docket entry, attachment, and page numbers as appearing in the case management/electronic case-file (CM/ECF) system.

[3] The children are identified here by their initials to protect their anonymity, privacy, and security.

Investigators suspected the infants' parents, Petitioner and his common law wife, Azucena

Rodriguez ("Rodriguez"), of causing the injuries. (*See* Dkt. No. 11-20 at 74). Petitioner was asked

by Albercio Velazquez, another investigator with the Sheriff's Office, to provide a statement.

(Dkt. No. 11-2 at 107). Petitioner did not admit at such time to hitting the girls. (*See id.*).

The next day, September 26th, Rodriguez was interviewed by Manuel Salinas, Jr., a third

investigator with the Sheriff's Office, and gave, in relevant part, the following written statement:

> I suspect that [Petitioner] had something to do with [A.M.]'s injuries because he
> was very abusive towards me when I was pregnant with our children . . . .
> [Petitioner] would accuse me of sleeping with a gringo, because the twins had a
> white complexion [unlike Petitioner] . . . . The last time that we had a fight was
> close to one week ago . . . . [Petitioner] threw me against the wall and knocked me
> to the floor several times and he also slapped me in the face once . . . .
>
> Sometimes it sounded as if someone were slapping [someone] and it was
> [Petitioner] slapping the twins. I would ask [Petitioner] why he would hit the twins
> and he would tell [me] that he hit them because they cried a lot . . . .
>
> On Thursday, September 24, 2015, I was cooking dinner at 10:00 p.m. I heard the
> twins crying very loudly and I went to see. I saw that [R.M.] was on the upper part
> of [A.M.]'s arm and [A.M.]'s arm was twisted. I grabbed [A.M.] and I fed her a
> bottle and put her in her bed. At 12:00 a.m. I got up to feed [the twin girls] again
> and I realized that [A.M.]'s arm was limp. I told [Petitioner] that we had to take
> [A.M.] to the hospital but he didn't want to take her because he was tired. My
> father and I wrapped up [A.M.]'s arm with a gauze and placed her back in her bed.
> I woke up at 7:00 a.m. and [Petitioner] made breakfast. I got the kids ready to take
> them to the hospital . . . . We went to a Western Union that is located on Canton
> Road and Expressway 281. Then we went to the Edinburg Children's Hospital . . .
> . [Petitioner] dropped us off and went back home.
>
> I think [A.M.] has her fractures because our son [B.M.] throws heavy toys into
> [A.M.]'s and [R.M.]'s crib but I also think that [Petitioner] caused some of the
> injuries, because I saw him beat the twins several times.

(*See id.* at 100-01).

After law enforcement officials determined that he lacked legal status to be present in the

United States (*see* Dkt. No. 11-20 at 197-198), Petitioner was detained and taken to a U.S. Border

Patrol station in McAllen, Texas (*see* Dkt. No. 11-14 at 7-8). On September 27th, Jonathan Flores,

a fourth investigator with the Sheriff's Office, interrogated Petitioner at the Border Patrol station.

(Dkt. No. 11-19 at 82-84). Petitioner gave the following written statement:

> My name is Juan Alberto Martinez and I want to say that on Thursday, September 24, 2015[,] I got home from work at 5:30. I got home angry. My wife asked me why I was angry and I got angrier and we started arguing. I went to bathe and saw that my two daughters were in their crib in the bathroom. When I went into the bathroom I closed the door. I saw that one of the girls was on top of the other one. I took her by the arm and pulled her hard to one side. The baby began to cry. I want to say that the baby whose arm I pulled was [A.M.]. I went in to bathe and a few hours later my wife told me that [A.M.]'s arm was hurt. I told my wife that we would take her to the hospital in the morning. I also want to add that in the past I have slapped [A.M.] and [R.M.] because they cry a lot. I want to say that a few days before I grabbed [A.M.] by the feet and picked her up. [A.M.] was hanging upside down by her feet. [A.M.] started crying when I did that. I want to say that I have also pulled [R.M.]'s arm in the past. I want to say that my wife [Rodriguez] is incapable of hurting our girls because she loves them very much.

(Dkt. No. 11-2 at 104).

## B. Arrest and Appointment of Counsel

Based on this statement, and after further investigation carried out by officials, Petitioner was arrested on December 1, 2016. (*See* Dkt. No. 11-2 at 10). Soon after, Petitioner was appointed Mr. Teodulo L. Lopez, Jr. as defense counsel, who would represent Petitioner through trial and sentencing. (*See id.* at 7; *see also* Dkt. No. 11-3 at 69). Upon Mr. Lopez's motion, the trial court appointed Ms. Lucia Regalado to serve as co-counsel. (Dkt. No. 11-3 at 13, 15-16).

## C. Filing of Charges

On January 24, 2017, Petitioner was charged by indictment with two counts of intentionally or knowingly causing serious bodily injury to a child in violation of Texas Penal Code § 22.04(a)(1). (Dkt. No. 11-2 at 8-9).

Rodriguez was charged with related counts of injury to a child by omission under the same statute. (Dkt. No. 11-11 at 4-5). She eventually pleaded guilty and, on or about July 21, 2017, was sentenced to a twenty-year term of imprisonment. (*Id.*).

**D. Motion to Suppress**

Before trial, Mr. Lopez filed a motion to suppress Petitioner's statement to Investigator Flores. (Dkt. No. 11-2 at 63-65). Mr. Lopez argued that the statement was involuntary and that Petitioner had not been admonished of his rights prior to making it. (*Id*. at 63-64). At a suppression hearing of August 29, 2017, the trial court took Investigator Flores' testimony.[4] (*See* Dkt. No. 11-14). The trial court orally denied Petitioner's motion to suppress, holding that "there were [no] improprieties in [Investigator Flores'] obtaining [of Petitioner's] confession." (*Id*. at 36-37).

**E. The Trial and Witness Testimony**

Petitioner's trial began on September 26, 2017. (Dkt. No. 11-2 at 13). The State, during its case-in-chief, called several witnesses, including: Investigator Mendez; Steve Moyar, a fifth investigator with the Sheriff's Office; Robert Vela, a special investigator with the Texas Department of Family and Protective Services; Investigator Flores; and Dr. Raquel Vargas-Whale, a physician with Driscoll Children's Hospital. The defense called Petitioner as its only witness. The State then called Rodriguez as a rebuttal witness.

    1. Investigator Mendez

Investigator Mendez testified regarding the initial investigations that occurred at the Edinburg Children's Hospital. (Dkt. No. 11-19 at 41-80). After arriving at the hospital, Investigator Mendez personally observed the infants and spoke, separately, with Petitioner and Rodriguez. (*Id*. at 46-48). On cross-examination, Investigator Mendez stated that when she and Rodriquez spoke, Rodriguez would habitually send text messages to someone prior to answering Investigator Mendez's questions. (*Id*. at 64). This behavior continued until Investigator Mendez

---

[4] The testimony that Investigator Flores gave at the pretrial suppression hearing was substantially identical to his trial testimony, which testimony is summarized below.

asked Rodriquez to put away her cellphone. (*Id.* at 65). Investigator Mendez admitted to having

no knowledge of the person with whom Rodriquez was communicating. (*Id.* at 64-65).

### 2. Investigator Moyar

Investigator Moyar testified regarding the general investigation into the cause of the

infants' injuries. (Dkt. No. 9-20 at 67-106). According to Investigator Moyar, the Sheriff's Office

obtained warrants to search Petitioner's and Rodriguez's cellphones for any relevant

communications. (*Id.* at 73-74). Investigator Moyar testified that investigators discovered several

encrypted messages in the phones' WhatsApp applications, but that the software available at the

Sheriff's Office was incapable of decrypting them. (*Id.* at 74-75).

### 3. Special Investigator Vela

Special Investigator Vela testified regarding conversations he had with Petitioner and

Rodriguez at Edinburg Children's Hospital on September 25th. (Dkt. No. 11-20 at 6-65). After

observing the infants and taking photographs of their injuries, Special Investigator Vela

individually spoke with Petitioner, Rodriguez, and Rodriguez's father. (*Id.* at 9-17). Special

Investigator Vela described Petitioner's demeanor as "[v]ery defensive," remarking that Petitioner

"couldn't believe that [law enforcement officials] were there to investigate him." (*Id.* at 13).

According to Special Investigator Vela, Petitioner was unable to answer several questions and

provided some inconsistent answers. (*Id.* at 14-15). Petitioner initially told Special Investigator

Vela that, before driving A.M. to the hospital that morning, Petitioner had to wait until his

employer paid him $240 so he could buy $20 worth of gasoline. (*Id.* at 15-16). But, after Special

Investigator Vela asked Petitioner to show him the remaining $220, Petitioner said he forgot to

add that he also paid $100 to his landlord. (*Id.* at 16). When asked, Petitioner could not provide

his landlord's or employer's name. (*Id.* at 16-17). Special Investigator Vela also testified that A.M. and R.M. suffered no additional injuries after being placed in protective care. (*Id.* at 27-28).

On redirect examination, Special Investigator Vela noted discrepancies between Petitioner's and Rodriguez's timeline of events. (*Id.* at 60). Petitioner told Special Investigator Vela that he had awoken around 11:00 a.m. on September 25th, while Rodriguez stated that the correct time was actually 7:00 a.m. (*Id.*). Special Investigator Vela also testified that both Petitioner and Rodriguez were unable to explain why an ambulance was not called immediately upon their discovery of A.M.'s injury to her arm. (*Id.*).

### 4. Investigator Flores

Investigator Flores testified regarding the circumstances in which he interviewed Petitioner. (Dkt. No. 11-19 at 82-122). After arriving at the Border Patrol station, Investigator Flores was required to secure his service weapon in a lock box before speaking with Petitioner. (*Id.* at 85). Investigator Flores advised Petitioner of his Miranda rights in Spanish, Petitioner's primary language, and Petitioner verbally indicated that he understood these rights and signed his initials next to each separate right on a form warning sheet. (*Id.* at 86-88; *see also* Dkt. No. 11-2 at 7). Petitioner then agreed to waive his right to remain silent. (Dkt. No. 11-19 at 93).

Investigator Flores obtained Petitioner's statement by first asking Petitioner to provide his "side of the story," after which Investigator Flores would periodically interject with questions. (*Id.* at 95). Upon completing the interview, Investigator Flores read the statement to Petitioner and asked him if everything written was true and correct, to which Petitioner responded affirmatively by signing the statement. (*Id.*). Investigator Flores further testified that at no point did Petitioner ask to have an attorney present or for the interview to stop; nor was Petitioner coerced, threatened, or promised anything to induce him to make his statement. (*Id.* at 93-94).

On cross-examination, Investigator Flores expressly denied ever telling Petitioner that his failure to provide a statement would cause Petitioner's wife, Rodriguez, to be arrested. (*Id.* at 118-19). Investigator Flores also denied telling Petitioner that his statement would prevent the infant girls from being placed in protective custody on a permanent basis. (*Id.* at 119).

5. Dr. Vargas-Whale

Dr. Vargas-Whale testified as to the nature and extent of the infants' injuries. (Dkt. No. 11-20 at 108-166). According to Dr. Vargas-Whale, an x-ray scan of A.M. revealed that she had approximately thirty injuries to her body, including a skull fracture, multiple rib fractures, a spiral fracture[5] to her right arm and wrist, a fracture to her left arm and hand, and fractures to both legs. (*Id.* at 115-35). Dr. Vargas-Whale also testified that R.M. had an arm fracture and multiple rib fractures. (*Id.* at 139-42). Dr. Vargas-Whale was able to rule out any metabolic disorders as the cause of A.M.'s multiple fractures because the "biochemical indicators of bone health in [A.M.] were entirely normal." (*Id.* at 135-36). She further testified that A.M. demonstrated no further injuries and that both infants' weight improved after they were "given good care." (*Id.* at 137-38).

On cross-examination, Mr. Lopez questioned Dr. Vargas-Whale regarding the cause of the infants' injuries. (*Id.* at 150-165). Dr. Vargas-Whale testified that the physical conduct Petitioner admitted to in his statement to Investigator Flores (i.e., slapping the infants' faces, pulling their arms, and holding them upside down by their feet) was not, by itself, consistent with many of the injuries she identified, including A.M.'s skull fracture and spiral arm and wrist fracture, R.M.'s arm fracture, and the infants' multiple rib fractures. (*Id.* at 153-65). Dr. Vargas-Whale also testified that the infants' injuries were healing at different stages. (*Id.* at 153).

---

[5] A "spiral fracture" is caused when a rotational motion is applied to a bone. (Dkt. No. 11-20 at 124).

### 6. Petitioner

Petitioner testified at trial as the only defense witness.  (Dkt. No. 11-20 at 177-210).
Petitioner testified that he was employed during September 2015 and would work five days per
week.  (*Id.* at 179).  According to Petitioner, he spent more of his time outside of his home than
within it, and that he was at work all day on September 24th.  (*Id.* at 180, 195).  Petitioner testified
that he and Rodriguez did not get into a fight during the late night of September 24th or the early
morning of September 25th, and that he never hit the infants.  (*Id.* at 195-96).  Petitioner also
testified that his son, B.M., would often throw heavy toys into the infants' crib.  (*Id.* at 189).

Petitioner claimed to learn about A.M.'s injury when he arrived home at midnight on
September 25th.  (*Id.* at 182).  Petitioner testified that, on the morning of the 25th, he woke up at
7:00 a.m. and waited until his boss could pay him.  (*Id.* at 184).  Afterward, Petitioner bought $20
worth of gasoline and "went directly to the hospital."  (*Id.*).

With respect to his first interview, Petitioner testified that Investigator Velasquez made
him feel "a little bit threatened" when he told Petitioner "that it had to be someone that was guilty
and, if not, both [Petitioner and Rodriguez] were going to have the same charge and the children
were going to be removed and they were going to be put up for adoption."  (*Id.* at 192-93).
According to Petitioner, this interaction with Investigator Velasquez eventually caused him to
change his statement when he spoke with Investigator Flores two days later.  (*Id.* at 193-94).
Petitioner testified that his initial statement to Investigator Velasquez was true, while his later
statement to Investigator Flores was false.  (*Id.* at 194).

### 7. Rodriguez

On rebuttal, Rodriquez testified as to Petitioner's treatment of the twins, their living
situation, the day the twins were taken to the hospital, and her multiple statements.  (Dkt. No. 11-

21 at 6-70).   According to Rodriguez, Petitioner would often slap the infants and throw them into

the air by pulling on their arms.  (*Id.* at 13-14, 17, 22-23).  Rodriguez also testified that her father

lived with her and Petitioner, her and Petitioner's first child, B.M., and the infant girls.  (*Id.* at 16-

17).  Rodriguez testified that Petitioner disliked the infant girls because they, unlike Petitioner,

"were light complected," and Petitioner accordingly suspected that they were the product of an

affair.  (*Id.* at 13).  Rodriguez testified that her father drove her, her children, and Petitioner to the

Edinburg Children's Hospital on September 25th after first stopping at a Western Union location.

(*Id.* at 24).   Rodriguez also testified to having received text messages from Petitioner regarding

the infant girls while she was at the hospital.  (*Id.* at 27).

According to Rodriguez, some of the information she gave in her statement to Investigator

Salinas—which was not itself entered into the record at trial—was untrue, such as her belief that

B.M.'s practice of throwing toys into the infants' crib caused many of their injuries.  (*Id.* at 28-

29).  Rodriguez also testified that she had already been sentenced for her omission convictions,

and that the prosecution had offered her nothing in exchange for her testimony.  (*Id.* at 30-31).

On cross examination, Rodriquez testified that Petitioner was not employed on or about

September 24, 2015 and was instead at home with her.  (*Id.* at 37-40).  Rodriguez also testified

that during the late night of September 24th, she and Petitioner got into a fight after Rodriguez

confronted Petitioner regarding his treatment of the infants.  (*Id.* at 44-45).  Rodriguez attempted

to call the police, but Petitioner broke her cellphone.[6]  (*Id.* at 45).  Afterward, Petitioner threw

Rodriquez against a wall, strangled her, bit her on the side of her face, and hit her on the nose with

---

[6] On redirect examination, Rodriguez explained that she was able to receive text messages from Petitioner while at the Edinburg Children's Hospital because Petitioner loaned his cellphone to her and Petitioner borrowed his cousin's cellphone. (Dkt. No. 9-21 at 69-70).

a glass, which caused her to lose consciousness. (*Id.* at 45-46). Upon regaining consciousness, Rodriquez checked on the infants and found that A.M.'s arm was injured. (*Id.* at 48-49).

Ms. Regalado also cross-examined Rodriquez regarding multiple out-of-court statements she gave to staff at the Edinburg Children's Hospital, Child Protective Services ("CPS"), and the Sheriff's Office. (*Id.* at 65-69). Rodriquez admitted to initially telling CPS that Petitioner would not hurt the children, that he was out working on September 24th, and that she gave a similar statement on two occasions to the Sheriff's Office. (*Id.* at 65-66). Rodriguez also admitted to having provided another statement to the Sheriff's Office in which she denied that Petitioner was abusive toward her or the children several days after giving her statement to Investigator Salinas. (*Id.* at 67). Ms. Regalado then noted that the in-court testimony Rodriguez had just given was not consistent with any of her prior statements. (*Id.* at 67-68). At one point during cross-examination, Rodriguez attempted to explain away the inconsistencies by claiming she was motivated by fear that she could be blamed for the infants' injuries. (*Id.* at 66-67).

## F. Conviction and Sentencing

On September 28, 2017, the jury found Petitioner guilty of both counts (Dkt. No. 11-3 at 44, 51), and he was then sentenced to two terms of life imprisonment (*id.* at 63, 68).

## G. State Appeal and Post-Conviction Review

Petitioner, through Mr. Lopez, filed a direct appeal with the Thirteenth Court of Appeals of Texas (Dkt. No. 11-3 at 80), and Mr. Rolando Garza was appointed to serve as appellate counsel (*see id.* at 89). The appellate court affirmed Petitioner's conviction on June 20, 2019. *See Morales Martinez*, 2019 WL 2532432, at *7. Petitioner then sought discretionary review with the Texas Court of Criminal Appeals (the "TCCA"), which refused review on September 11, 2019. (Dkt. No. 11-37).

On February 19, 2020, Petitioner filed a state habeas application with the TCCA, challenging his convictions and sentences. (*See* Dkt. No. 11-47 at 87, 104). On August 20, 2020, the trial court issued findings of fact and conclusions of law. (*Id.* at 154, 160). On November 18, 2020, the TCCA, without a written order, denied Petitioner's application based on the trial court's findings and conclusions and its own review of the record. (*See* Dkt. No. 11-44).

## H. Federal Habeas Proceedings

The Petition was filed on January 7, 2021.[7] (Dkt. No. 1-1 at 12). Soon thereafter, the undersigned Magistrate Judge granted Petitioner's accompanying motion to proceed in forma pauperis (Dkt. No. 3) and ordered Respondent to file a responsive pleading (Dkt. No. 5 at 2).

On April 23, 2021, Respondent filed the Summary Judgment Motion. (Dkt. No. 10). Petitioner failed to submit a response within the 21-day timeframe allotted by the Local Rules of the United States District Court for the Southern District of Texas. *See* S.D. Tex. L.R. 7.3 & 7.4. On June 14, 2021, Petitioner was notified of his right to respond to the Summary Judgment Motion and ordered to file any response within 14 days. (Dkt. No. 12).

Petitioner filed a response on June 26, 2021. (Dkt. No. 13 at 23).

## II. GROUNDS FOR RELIEF

Petitioner raises what the undersigned construes as five classes of claims for relief.

First, Petitioner brings a "no evidence" claim, arguing that his convictions were not supported by any evidence. (Dkt. No. 1 at 6; Dkt. No. 1-1 at 15-19).

Second, Petitioner contends that Mr. Lopez and Ms. Regalado rendered ineffective assistance of counsel insofar as they (i) failed to challenge inconsistencies between Rodriguez's

---

[7] This is the date on which Petitioner claims to have placed the Petition in the prison mailing system. (Dkt. No. 1-1 at 12). Filings by pro se prisoners are governed by the mailbox rule, such that they are deemed filed when they are deposited for mailing. *Medley v. Thaler*, 660 F.3d 833, 835 (5th Cir. 2011) (per curiam).

multiple statements; (ii) failed to investigate Rodriquez's allegation that she was physically beaten by Petitioner; (iii) failed to request a written order on the issue of voluntariness after the trial court denied Petitioner's motion to suppress his statement to Investigator Flores; and (iv) failed to request an accomplice witness jury instruction. (Dkt. No. 1 at 6-7; Dkt. No. 1-1 at 19-21; Dkt. No. 11-47 at 98-99). Petitioner also claims that appellate counsel, Mr. Garza, rendered ineffective assistance because he filed a motion to abate Petitioner's appeal pending the trial court's issuance of a written order denying the motion to suppress. (Dkt. No. 1 at 7; Dkt. No. 11-47 at 100-01).

Third, Petitioner claims that he was convicted based on false evidence, specifically, his statement to Investigator Flores. (Dkt. No. 1 at 7; Dkt. No. 1-1 at 8).

Fourth, Petitioner claims that his statement to Investigator Flores was involuntary. (Dkt. No. 1 at 7; Dkt. No. 1-1 at 8).

Fifth, Petitioner claims that he is actually innocent of the offenses. (*Id.* at 7).

## III. LEGAL STANDARDS

### A. Collateral Review Under § 2254

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996, federal courts may grant habeas corpus relief for persons in state custody. Section 2254(d) provides in pertinent part as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to a Supreme Court decision on a question of law or if it arrives at a different result than the Supreme Court did on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs where "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. The standard is "objectively unreasonable." *Id.* Indeed, "a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

This deferential standard applies even where, as here, the TCCA has denied habeas relief without written order. *Santellan v. Cockrell*, 271 F.3d 190, 193-94 (5th Cir. 2001). There is no requirement that a state court write an opinion explaining its reasoning. *Harrington v. Richter*, 562 U.S. 86, 98 (2011). "For such a situation, [the federal habeas court]: (1) assumes that the state court applied the proper 'clearly established Federal law'; and (2) then determines whether its decision was 'contrary to' or 'an objectively unreasonable application of' that law." *Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003). Otherwise, a federal habeas court will look to the last reasoned state court opinion. *See Salts v. Epps*, 676 F.3d 468, 479 (5th Cir. 2012).

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99. Insofar as the interpretation of state law is concerned, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions[,]" and "[i]n conducting

habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Any factual findings by the state court are entitled to a presumption of correctness, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This review is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

A pro se petitioner's pleadings are construed liberally. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (per curiam). At the same time, to raise a constitutional issue, they must plead sufficient facts beyond conclusory allegations. *Black v. Davis*, 902 F.3d 541, 547 (5th Cir. 2018).

## B. Exhaustion

A petitioner "must exhaust all available state remedies before he may obtain federal habeas corpus relief." *Sones v. Hargett*, 61 F.3d 410, 414 (5th Cir. 1995). Section 2254(b) provides in this regard as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B) (i) there is an absence of available State corrective process; or
>
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b).

A petitioner has "exhausted" their state remedies where they have fairly presented the substance of their claims to the state courts. *Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir. 1983). Generally, this requires presenting those claims to the highest court of the state on either direct or collateral review. *Busby v. Dretke*, 359 F.3d 708, 723 (5th Cir. 2004).

It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made. *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982)) (quotations omitted). A petitioner has not exhausted their claims when they present, on federal habeas review, new legal theories distinct from those raised before the state court. *Nickleson v. Stephens*, 803 F.3d 748, 753 (5th Cir. 2015). Moreover, "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

Unexhausted claims may not provide the basis for habeas relief unless there is an applicable exhaustion exception or the state waives an exhaustion defense. *See Mercadel v. Cain*, 179 F.3d 271, 276-77 (5th Cir. 1999) (per curiam). A state's waiver of an exhaustion defense must be express and made through counsel. 28 U.S.C. § 2254(b)(3). Notwithstanding a petitioner's failure to exhaust, a federal court may deny a petition on the merits. 28 U.S.C. § 2254(b)(2); *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998).

A § 2254 petition containing both exhausted and unexhausted claims is considered a "mixed" petition. *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir. 1998). A mixed petition must ordinarily "be dismissed without prejudice . . . unless there is an absence of available State corrective process or circumstances exist that render such process ineffective to protect the rights of the applicant." *Id.* (quoting 28 U.S.C. § 2254(b)(1)(B)). Nonetheless, a federal habeas court may deny a mixed petition on the merits. *See* 28 U.S.C. § 2254(b)(2).

A federal court has the authority to sua sponte raise the exhaustion issue provided that the state has not waived it. *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir. 2010).

## C. Procedural Default

Pursuant to the procedural default doctrine, federal habeas relief from state convictions is generally unavailable on claims that are barred under state law because of a petitioner's failure to comply with state procedural rules. *Webb v. Blackburn*, 773 F.2d 646, 648 (5th Cir. 1985) (citing *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977)). For the doctrine to apply, the last state court rendering a judgment in the case must "clearly and expressly" state that the judgment rests on a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989); *see also Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995). That bar must be independent and adequate, meaning that it (i) must not "rest primarily on federal law" or "be interwoven with the federal law" and (ii) must be "strictly or regularly followed by the cognizant state court." *Amos*, 61 F.3d at 338-39 (collecting cases).

When a claim is procedurally defaulted, federal habeas review of such claim is barred unless the petitioner can (i) show (a) cause for the default and (b) actual prejudice as a result of the alleged violation of federal law, or (ii) "demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991). The "miscarriage of justice" exception applies only when a petitioner is actually innocent of the offense of conviction. *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992).

A petitioner's failure to bring record-based claims on direct appeal can render such claims procedurally barred, *see Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007), as can a petitioner's failure to exhaust claims through their state habeas petition when successive petitions are not permitted under state law, *see Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005). "Texas courts have long held that 'the writ of habeas corpus should not be used to litigate matters which should have been raised on direct appeal,'" *Buntion v. Lumpkin*, 982 F.3d 945, 951 (5th Cir. 2020) (per curiam) (quoting *Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004)), which

requirement constitutes an adequate and independent state law ground barring federal habeas review, *Dorsey*, 494 F.3d 527 at 532. Likewise, Texas law generally does not permit successive state habeas petitions. TEX. CODE. CRIM PROC. art. 11.07 § 4(a); *Wilder*, 274 F.3d at 262.

As with exhaustion, federal courts may sua sponte raise the issue of procedural default, although they are counseled to "not do so lightly." *United States v. Clark*, 2021 WL 1652042, at *4 (5th Cir. 2021) (per curiam) (citing *United States v. Willis*, 273 F.3d 592, 597 (5th Cir. 2001)).

## D. Ineffective Assistance of Counsel

An ineffective-assistance-of-counsel claim is analyzed according to the Supreme Court's two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. Thus, under *Strickland*, the petitioner must show that counsel's performance was both (i) deficient and (ii) prejudicial.

Counsel's performance is deficient where it falls below an objective standard of reasonableness. *Id.* at 688. In reviewing this *Strickland* factor, "every effort [is] made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Counsel will be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. A court will not second-guess strategic decisions or fault counsel for deviations from best practices. *Premo v. Moore*, 562 U.S. 115, 122 (2011). Rather,

the court looks to whether the attorney was incompetent under "prevailing professional norms." *Id.* Moreover, the reasonableness of counsel's conduct must be viewed as of the time of that conduct, *Maryland v. Kulbicki*, 577 U.S. 1, 4 (2015) (per curiam), such that it is based on the law in place when the potential error occurred, *United States v. Webster*, 392 F.3d 787, 796 (5th Cir. 2004). There is no duty of counsel to anticipate changes in the law. *United States v. Fields*, 565 F.3d 290, 296 (5th Cir. 2009).

To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.* This showing is specific to the stage of the proceedings in which the deficient performance is alleged to have occurred.

The burden of proof to establish ineffective assistance is upon the petitioner, who must do so by a preponderance of the evidence. *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992). The failure to raise a meritless argument is an insufficient basis for ineffective assistance because the result of the proceeding would not have been different had the issue been raised. *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). Also, mere conclusory allegations of ineffective assistance do not raise a constitutional issue. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000).

If the petitioner fails to prove one *Strickland* prong, the other prong need not be considered; nor must the prongs be analyzed in any particular order. *Strickland*, 466 U.S. at 697.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal quotations and citations omitted). In such a case, "the test is whether the state court's

decision . . . was contrary to, or an unreasonable application of, . . . clearly established federal law. . . ." *Schaetzle*, 343 F.3d at 444.

## IV. ANALYSIS

Each of Petitioner's five classes of claims will be discussed in turn.

### A. No Evidence

Petitioner makes a "no evidence" claim. (Dkt. No. 1 at 6; Dkt. No. 1-1 at 5-9). Essentially, Petitioner "alleges that the trial court's record is totally devoid of any evidence pointing to his guilt or any evidence connecting [Petitioner] to the cause of serious bodily injuries to a child . . . ." (Dkt. No. 1-1 at 5). In this regard, Petitioner flags Dr. Vargas-Whale's testimony that the conduct Petitioner admitted to in his statement to Investigator Flores would not fully explain the infants' injuries. (*Id.*). Respondent argues that this claim is procedurally barred. (Dkt. No. 10 at 11-15).

Under Texas law, a "no evidence" claim requires a showing that the record is totally devoid of support for the convictions at issue. *See Ex parte Williams*, 703 S.W.2d 674, 679-80 (Tex. Crim. App. 1986) (en banc). A related claim of insufficient evidence requires a showing that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Petitioner did not raise either of these claims on direct appeal. *See Morales Martinez*, 2019 WL 2532432, at *1. Instead, Petitioner raised only his no evidence claim on state habeas review. (Dkt. No. 11-47 at 92-93). The trial court seemingly construed this claim as either a sufficiency or no evidence claim, noting that "[a] claim of legal sufficiency is not cognizable in state post-conviction collateral attack [proceedings]," but that a no evidence claim "is always cognizable . . . regardless of whether it was . . . raised at any previous stage." (Dkt. No. 11-47 at 155 (citing *Ex parte Perales*, 215 S.W.3d 418, 419-20 (Tex. Crim. App. 2007)). So

construed, the trial court deemed the sufficiency claim procedurally barred and the no evidence claim meritless. (*Id.* at 155-56). The TCCA, without a written opinion, denied Petitioner's state habeas corpus application based "on [the] findings of [the] trial court . . . and on the court's independent review of the record." (Dkt. No. 11-44).

On federal habeas review, Petitioner's claim can only be construed as a sufficiency claim, as true no evidence claims are merely the product of Texas state law. *See Lowery v. Davis*, 2019 WL 1099007, at *4 (N.D. Tex. March 8, 2019) ("[Under] federal law . . . a no-evidence claim is treated as a challenge to the sufficiency of the evidence under [*Jackson*]); *see also Walker v. Quarterman*, 2007 WL 1795704, at *7 (S.D. Tex. June 20, 2007); *Crouch v. Quarterman*, 2009 WL 321280, at *1 (N.D. Tex. Feb. 9, 2009). Again, the applicable standard for a sufficiency claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Uvalle-Patricio*, 478 F.3d 699, 701 (5th Cir. 2007) (quoting *Jackson*, 443 U.S. at 319) (emphasis in original). Moreover, "[a]ll credibility choices and conflicting inferences are to be resolved in favor of the verdict," *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005), and "the evidence offered by the prosecution should be assumed to be true[,]" *United States v. Lopez-Urbina*, 434 F.3d 750, 757 (5th Cir. 2005).

Because the trial court determined that Petitioner's claim was procedurally barred if construed as a sufficiency claim, and the TCCA *denied* (i.e., did not merely dismiss) Petitioner's state habeas application without a written order, the TCCA accordingly indicated that such denial rested on a state procedural bar. *See Ex parte Grigsby*, 137 S.W.3d 673, 674 (Tex. Crim. App. 2004) ("[W]here an applicant challenges the sufficiency of the evidence on an application for a writ of habeas corpus, and [the TCCA] subsequently dispose[s] of the application by entering a

denial without written order, the applicant's sufficiency claim was denied because the claim is not cognizable."); *see also Reed v. Thaler*, 428 F. App'x 453, 454 (5th Cir. 2011) (per curiam); *West v. Johnson*, 92 F.3d 1385, 1398 n.18 (5th Cir. 1996). Moreover, this state procedural default is an independent and adequate state law ground to invoke the procedural bar insofar as it is not based on federal law and Texas courts have routinely held that a sufficiency claim is not cognizable on state habeas review. *See Ex parte Knight*, 401 S.W.3d 60, 64 (Tex. Crim. App. 2013); *see also Ex parte Ajao*, 2018 WL 4183119, at *8 (Tex. App.—Fort Worth Aug. 31, 2018, no pet.) (mem. op.); *Ex parte McCracken*, 2016 WL 4124063, at *2 (Tex. App.—San Antonio Aug. 3, 2016, pet. ref'd) (mem. op.). Accordingly, Petitioner's claim is procedurally defaulted, and he otherwise fails to address why a sufficiency claim was not raised on direct appeal.

Regardless of any procedural bar, Petitioner's sufficiency claim lacks merit. The evidence presented at trial included: (i) Petitioner's statement to Investigator Flores in which he admitted to slapping the three-month old twins on their faces, pulling on their arms, and holding them upside down by their feet; (ii) Rodriguez's testimony that Petitioner would often slap the twins and throw them into the air by their arms;[8] and (iii) Dr. Vargas-Whale's testimony describing the children's multiple injuries, her statement that A.M. did not suffer any additional injuries after she was placed in protective custody, and her testimony that the injuries were healing at different stages, from which the jury could infer that such injuries had occurred over a period of time. A jury may treat evidence, including a confession, that a defendant committed certain assaultive acts on a child to be circumstantial evidence that the defendant committed the acts which caused the injuries at

---

[8] Although Rodriguez testified only as a rebuttal witness, the jury was entitled to consider her testimony. "As a general rule, the State is entitled to present on rebuttal any evidence that tends to refute a defensive theory and the evidence introduced to support that theory." *Collmorgen v. State*, 2020 WL 4210494, at *7 (Tex. App.—Houston [1st Dist.] July 23, 2020, pet. ref'd) (mem. op.).

issue.[9] *See, e.g., Bowen v. State*, 640 S.W.2d 929, 932 (Tex. Crim. App. 1982) ("On consideration of appellant's admission that he repeatedly assaulted the baby, . . . we are constrained to hold the circumstantial evidence is sufficient to support the trial court's findings of appellant's . . . acts which caused the death of the child."); *see also United States v. Lowe*, 795 F.3d 519, 522-23 (6th Cir. 2015) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt."). The undersigned concludes that this evidence, when viewed in the light most favorable to the prosecution and with all credibility questions and inferences resolved in favor of the verdict, was not critically deficient.[10]

For these reasons, the Magistrate Judge concludes that this construed sufficiency claim is procedurally barred, otherwise lack merits, and should be denied.

## B. Ineffective Assistance of Counsel

Petitioner raises four sub-claims of ineffective assistance as to Mr. Lopez and Ms. Regalado (Dkt. No. 1 at 6-7; Dkt. No. 1-1 at 9-11) and one sub-claim as to Mr. Garza (Dkt. No. 1 at 7; Dkt. No. 11-47 at 100-01), each of which will be addressed in turn.

---

[9] While Petitioner challenges the admissibility of his statement to Investigator Flores, admissibility questions are not considered under a sufficiency claim. *See, e.g., Hanebutt v. Carpenter*, No.1:11-1192-JDB-egb (W.D. Tenn. Sept. 26, 2014) ("A challenge to the sufficiency of the evidence involves an examination of the evidence introduced at trial, not a belated challenge to the admissibility of some of that evidence."); *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013) ("When conducting a legal sufficiency review, this Court considers all evidence in the record of the trial, whether it was admissible or inadmissible."). Regardless, as discussed below, Petitioner fails to show that the statement was false, involuntary, or otherwise inadmissible.

[10] Moreover, the jury had at is disposal additional testimony from which to determine Petitioner's guilt, including: (i) Investigator Mendez's testimony that Rodriguez would habitually send and receive text messages prior to answering any questions, paired with Rodriguez's testimony that she was texting Petitioner; (ii) Special Investigator Vela's testimony regarding Petitioner's demeanor at the hospital and his inability to answer or provide consistent answers to several questions; and (iii) Rodriguez's rebuttal testimony that Petitioner was unemployed on or about September 24th and was accordingly at home with her on that date.

### 1. Failure to Challenge Inconsistencies in Rodriguez's Statements

First, Petitioner complains that Mr. Lopez and Ms. Regalado failed to "raise and challenge the inconsistencies in [Rodriguez's] out of court statement[s]." (Dkt. No. 1 at 6).

The trial court recommended denial of this claim chiefly on the ground that Petitioner failed to establish *Strickland* prejudice. (*See* Dkt. No. 11-47 at 156-57). Even if additional challenges to her inconsistent statements would have successfully impeached Rodriguez, the trial court reasoned, the jury had alternative evidence to convict Petitioner, including (i) his statement to Investigator Flores in which he admitted to slapping the infants on their faces, pulling on their arms, and holding them upside down by their feet and (ii) Dr. Vargas-Whale's testimony regarding the extent of the infants' injuries and the fact that they received no additional injuries after being placed in protective care. (*See id.*). Moreover, the trial evidence established that Petitioner, Rodriguez, and Rodriguez's father were the only adults living at Petitioner's house, and no witness implicated Rodriguez's father. The ultimate denial of this sub-claim of ineffective assistance was not "contrary to, or an unreasonable application of" *Strickland*.[11] *See* 28 U.S.C. § 2254(d)(1).

For these reasons, the Magistrate Judge concludes that this sub-claim of ineffective assistance lacks merit and should be denied.

### 2. Failure to Investigate Rodriguez's Allegations of Physical Abuse

Second, Petitioner claims that Mr. Lopez and Ms. Regalado were ineffective because they failed to investigate Rodriguez's testimony regarding her physical assault by Petitioner during the

---

[11] Although the trial court did not address the factual accuracy of Petitioner's claim, his allegation that trial counsel did not challenge inconsistencies in Rodriguez's statements is expressly belied by the record. At trial, Ms. Regalado did, in fact, question Rodriguez as to inconsistencies between her many out-of-court statements and the testimony she had just given at trial. (*See* Dkt. No. 11-21 at 65-69). Accordingly, Petitioner cannot credibly argue that trial counsel's performance was deficient. *See Garland v. United States*, 1995 WL 122776, at *1 (6th Cir. March 21, 1995) (holding that ineffective assistance claim was meritless insofar as "trial counsel properly pursued inconsistencies in a witness's testimony").

late night of September 24th. (Dkt. No. 1 at 7). According to Petitioner, trial counsel should have refuted Rodriguez's testimony by interviewing and calling as witnesses persons whom Rodriguez spoke to shortly after the alleged assault, including Investigator Mendez, Investigator Flores, other investigators with the Sheriff's Office, and staff at the hospital. (Dkt. No. 1-1 at 11).

Again, the trial court recommended denial of this claim in part on the ground that Petitioner failed to establish *Strickland* prejudice. (*See* Dkt. No. 11-47 at 157-58). The trial court concluded that additional investigation into Rodriguez's statements regarding her physical assault could have only diminished her credibility to the jury; it would not have disproved or weakened the State's merits case against Petitioner. (*See id.* at 158). Even if Rodriguez were successfully impeached, the jury would, as discussed above, have independent evidence from which to find Petitioner guilty of the charged offenses. The denial of this sub-claim of ineffective assistance based on the trial court's prejudice finding was not contrary to, or an unreasonable application of, *Strickland*.[12]

For these reasons, the Magistrate Judge concludes that this sub-claim of ineffective assistance lacks merit and should be denied.

### 3. Failure to Request Written Order Following Denial of Motion to Suppress

Third, Petitioner complains of trial counsel's failure to request a written order from the trial court regarding its denial of the motion to suppress. (Dkt. No. 1 at 7; Dkt. No. 11-47 at 98-99). According to Petitioner, this failure rendered his statement to Investigator Flores inadmissible at trial. (Dkt. No. 11-47 at 99). In support, Petitioner points to Article 38.22 of the Texas Code of Criminal Procedure, which provides in part that—

> [i]f [a written statement made by an accused as a result of custodial interrogation] has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter

---

[12] Moreover, Petitioner does not allege with specificity what additional investigation would have revealed, as is required. *See Adekeye v. Davis*, 938 F.3d 678, 683 (5th Cir. 2019) (citing *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)).

an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause.

TEX. CODE. CRIM. PROC. art. 38.22 § 6.

On state habeas review, this claim was denied in part due to a determination that the lack of a written order did not render Petitioner's statement inadmissible. (Dkt. No. 11-47 at 158). To the contrary, as the trial court noted, the statutory provision at issue only prescribes a written order *after* the trial judge has already determined that a statement was made voluntarily and is admissible. (*Id.* (citing TEX. CODE. CRIM. PROC. art. 38.22 § 6)). In other words, because a written order is necessitated by a finding that a statement is voluntary and inadmissible, the lack of such an order cannot render the statement involuntary or inadmissible. (*See id.*). Moreover, when a trial court fails to issue a written order, the proper remedy is not to suppress the statement at issue, but rather "to abate the appeal and order the trial court to make the findings of fact as required by [Article 38.22 § 6.]" *Berry v. State*, 995 S.W.2d 699, 701 (Tex. Crim. App. 1999). "Because failure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness," *Green v. Johnson,* 160 F.3d 1029, 1037 (5th Cir. 1998), Petitioner cannot demonstrate that his trial counsel's performance on this issue was deficient.[13]

For these reasons, the Magistrate Judge concludes that this sub-claim of ineffective assistance lacks merit and should be denied.

---

[13] To the extent Petitioner's claim can be construed as an objection to the state habeas court's interpretation of the applicable Texas statutory provision, such a claim would be non-cognizable on federal habeas review. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions[,]" and "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *McGuire*, 502 U.S. at 67-68.

### 4.  Failure to Request Accomplice Witness Jury Instruction

Fourth, Petitioner argues that trial counsel should have requested an accomplice witness jury instruction regarding Rodriguez's testimony. (Dkt. No. 1-1 at 11).

Under Texas law, an "accomplice witness" is defined as someone who "either as a principal, accomplice, or accessory, was connected with the crime by unlawful act or omission on his part, transpiring either before, at the time of, or after the commission of the offense, and whether or not he was present and participated in the crime." *Singletary v. State*, 509 S.W.2d 572, 575 (Tex. Crim. App. 1974).  When the evidence clearly shows that a witness is an accomplice, a trial court must instruct the jury of this fact, and when there is conflict in the evidence the trial court must submit the issue to the jury for its consideration. [14] *See Jones v. State*, 1995 WL 353490,

---

[14] For reference, the pattern instruction that applies where a testifying witness is an accomplice as a matter of law provides, in pertinent part, as follows:

> A person cannot be convicted of a crime on the uncorroborated testimony of an accomplice. An accomplice is someone whose participation in the crime would permit his conviction for the crime charged in the [indictment/information] [*include if applicable:* or a lesser included offense of that crime].

> [*Name of accomplice*] is an accomplice to [the crime of [*offense*], if it was committed/[*offense*], a lesser included offense of the crime charged in the [indictment/information]].  The defendant, [*name of defendant*], therefore cannot be convicted on the testimony of [*name of accomplice*] unless that testimony is corroborated.

> Evidence is sufficient to corroborate the testimony of an accomplice if that evidence tends to connect the defendant, [*name of defendant*], with the commission of any offense that may have been committed.  Evidence is not sufficient to corroborate the testimony of an accomplice if that evidence merely shows the offense was committed.

TEX. CRIM. PATTERN JURY INSTRUCTIONS § CPJC 3.3.  Where a testifying witness's status as an accomplice presents a question of fact, the pattern instruction provides, in pertinent part, as follows:

> A person cannot be convicted of a crime on the uncorroborated testimony of an accomplice. An accomplice is someone whose participation in the crime would permit his conviction for the crime charged in the [indictment/information] [*include if applicable:* or a lesser included offense of that crime].

> You must determine whether [*name of accomplice*] is an accomplice to the crime of [*offense*], if it was committed [*include if applicable:* or a lesser included offense of that

at *2 (Tex. App.—Houston [14th Dist.] June 8, 1995, pet. ref'd) (per curiam). Here, based on her omission convictions, Rodriguez's testimony was arguably accomplice testimony.

On direct appeal, Petitioner raised a related claim that the trial court erred by failing to give an accomplice witness jury instruction. *See Morales Martinez*, 2019 WL 2532432, at *1. However, Petitioner failed to raise this issue in the context of an ineffective assistance claim on direct appeal or on state habeas review, rendering it unexhausted. Because Texas generally forbids successive habeas petitions, *see* TEX. CODE. CRIM PROC. art. 11.07 § 4(a), Petitioner's failure to raise this claim in his state habeas petition also renders it procedurally defaulted. *See Neville*, 423 F.3d at 480. Petitioner demonstrates no cause for this default, and, although Respondent did not raise a procedural bar defense, the District Court is permitted to sua sponte raise the issue considering that this Report serves to notify Petitioner of the same.[15]  *See Magouirk v. Phillips*, 144 F.3d 348, 359 (5th Cir. 1998); *see also Day v. McDonough*, 547 U.S. 198, 209-11 (2006).

Regardless, Petitioner fails to satisfy *Strickland*'s prejudice prong because he does not establish that, but-for trial counsel's failure to request an accomplice witness jury instruction, the result of the proceedings would have been different. Even if the trial court were to have given an accomplice witness jury instruction, Petitioner cannot establish that such instruction would have

---

crime]. If you determine that [*name of accomplice*] is an accomplice, you must then also determine whether there is evidence corroborating the testimony of [*name of accomplice*].

TEX. CRIM. PATTERN JURY INSTRUCTIONS § CPJC 3.4.

[15] In raising the issue of procedural default or exhaustion sua sponte, a federal court must consider whether the petitioner has been given notice of the issue, whether the petitioner has had a reasonable opportunity to argue against the issue's application, and whether the State waived the defense. *See Smith v. Johnson*, 216 F.3d 521, 523-34 (5th Cir. 2000) (per curiam); *see also Day v. McDonough*, 547 U.S. 198, 209-11 (2006). Generally speaking, a magistrate judge's report and recommendation is sufficient for such purposes where the report (i) sets forth the exhaustion or procedural bar issue regarding a particular claim and (ii) gives a petitioner an opportunity to submit objections for the district court's consideration. *See Magouirk v. Phillips*, 144 F.3d 348, 359 (5th Cir. 1998).

impacted the jury's ultimate decision to convict, especially given that his statement to Investigator Flores acted to corroborate much of Rodriguez's testimony.[16]

For these reasons, the Magistrate Judge concludes that this sub-claim of ineffective assistance lacks merit and should be denied.

### 5. Appellate Counsel's Motion to Abate Appeal

Fifth, according to Petitioner, Mr. Garza's filing of a motion to abate the appeal pending the written order denying the motion to suppress constituted ineffective assistance. (Dkt. No. 1 at 7; Dkt. No. 11-47 at 100-01). According to Petitioner, Mr. Garza "failed to familiarize himself with the existing law" and discover that the motion to abate was "meritless" because, by the time Mr. Garza filed the motion, the appellate court "had already received the trial court's Clerk's Record." (Dkt. No. 11-47 at 128). Petitioner argues further that, had Mr. Garza not filed his motion to abate, the trial court would not have entered a voluntariness order and, accordingly, the appeals court would have ruled that the lack of such order "rendered [Petitioner's] statement involuntary and would have reversed [his] conviction . . . ." (*Id.*).

Petitioner's claim that the motion to abate was meritless is not supported by applicable law or the record. As stated above, Article 38.22 requires a written order as to the voluntariness of a confession, TEX. CODE. CRIM. PROC. art. 38.22 § 6, and the Thirteenth Court of Appeals granted Mr. Garza's motion (Dkt. No. 11-4 at 4-5). Indeed, "[t]he requirements of [Article 38.22] are mandatory and require the trial court to file its findings regardless of whether or not the defendant objects to the failure to do so." *Lacca v. State*, 696 S.W.2d 645, 648 (Tex. App.—Houston [14th Dist.] 1985, pet. ref'd) (citing *Dykes v. State*, 649 F.W.2d 633, 636 (Tex. Crim. App. 1983) (en banc)). Moreover, as also discussed above, a trial court's failure to reduce its voluntariness finding

---

[16] Indeed, it was on this basis that the appeals court rejected Petitioner's underlying claim. *See Morales Martinez*, 2019 WL 2532432, at *5-6.

to a written order does not render the statement inadmissible. Because Petitioner fails to show that, but-for appellate counsel's filing of the motion to abate, the result of the proceedings would have been different, this claim fails. *See Strickland*, 466 U.S. at 694.

For these reasons, the Magistrate Judge concludes that this sub-claim of ineffective assistance of appellate counsel lacks merit and should be denied.

## C. Use of False Evidence

Petitioner alleges that his statement to Investigator Flores was false. (Dkt. No. 1 at 7). In his own words, "[the] statement is false and the wording in the statement does not connect or support the cause of the injuries." (*Id.*). This can be construed as a claim under the Fourteenth Amendment that the State improperly obtained the criminal conviction through the knowing use of false evidence. *See Miller v. Pate*, 386 U.S. 1, 7 (1967); *see also Rogers v. Lee Cnty., Miss.*, 684 F. App'x 380, 390 n.36 (5th Cir. 2017). Petitioner did not raise these issues on direct appeal, and Respondent raises a procedural default defense. (*See* Dkt. No. 10 at 27-29).

Petitioner's failure to raise this claim on direct appeal renders it procedurally barred. *Buntion*, 982 F.3d at 951; *Dorsey*, 494 F.3d 527 at 532. Moreover, Petitioner's failure to raise this claim in his state habeas petition renders it unexhausted, which failure to exhaust cannot be remedied through a successive state habeas petition under Texas law, *see* TEX. CODE. CRIM PROC. art. 11.07 § 4(a), and thus constitutes a separate procedural bar, *Neville*, 423 F.3d at 480. Accordingly, this claim is procedurally defaulted, and Petitioner makes no showing of cause for this default. *See Thomas v. Cockrell*, 2004 WL 856609, at *10 (W.D. Tex. Apr. 16, 2004).

On the merits, Petitioner's claim appears to be distinct from a traditional false evidence claim in which a petitioner argues that the prosecution at trial created a "deliberate deception of court and jury by [presenting] testimony known to be perjured." *Canales v. Stephens*, 765 F.3d

551, 573 (5th Cir. 2014) (quoting *Mooney v. Holohan*, 294 U.S. 103, 122 (1935)). Indeed, Petitioner never claims that he did not give a statement to Investigator Flores, nor does he claim that the statement as written does not reflect what he told Investigator Flores. Instead, Petitioner claims that he gave the statement out of fear that, had he not done so, Rodriguez would be implicated in the crime and the infant girls would be placed in protective custody. Stated this way, Petitioner's claim appears to not be a false evidence claim, but rather a claim that his statement to Investigator Flores was involuntary. So construed, Petitioner's claim fails on the merits and otherwise for the reasons outlined below.

Additionally, Petitioner's claim fails on the merits even if construed as a traditional false evidence claim. To state a false evidence claim, a petitioner must show that (1) the evidence was false, (2) state officials knew the evidence was false, and (3) the evidence was material. *Canales*, 765 F.3d at 573. Evidence "is material if there is any reasonable likelihood that the false [evidence] could have affected the judgment of the jury." *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Although Petitioner's statement was likely material, Petitioner does not meet the first two requirements. Petitioner does not offer any evidence beyond self-serving remarks to demonstrate that the statement was false, such as his assertion that he purposefully gave a false statement to Investigator Flores in order to prevent Rodriguez from being punished and the infant girls from being placed in protective custody on a permanent basis. Petitioner also fails to offer any evidence, other than conclusory statements, that state officials knew that the statement was false if, in fact, it was.

For these reasons, the Magistrate Judge concludes that Petitioner's false evidence claim is procedurally barred, otherwise without merit, and should be denied.

**D. Involuntary Statement**

Petitioner also claims that his statement to Investigator Flores was involuntary insofar as it was given "out of fear, threat and/or manipulation." (Dkt. No. 1 at 7). As discussed, at trial, Petitioner testified that Investigator Velasquez told Petitioner that if he did not admit to causing the infants' injuries, then Rodriguez would be arrested and the children would be placed in protective custody. (Dkt. No. 11-20 at 192-93). Petitioner testified that this interaction caused him to give his statement to Investigator Flores two days later in which he admitted to pulling the twin girls' arms, slapping them on their faces, and holding them upside down by their feet. (*Id.* at 194). Petitioner also claims that Investigator Flores exploited Petitioner's lack of education and alleged "low intelligence" insofar as he "coordinated the wording within the statement . . . to be consistent with the acts or very similar to the act[s]" that produced A.M.'s and R.M.'s injuries. (Dkt. No. 1-1 at 8). The undersigned construes Petitioner's claim to be that his statement was given involuntarily as a product of coercion in violation of the Due Process Clause of the Fourteenth Amendment. *See Jackson v. Denno*, 378 U.S. 368, 376-77 (1964). Although Petitioner failed to raise this claim on state direct or collateral review, Respondent did not invoke a procedural bar defense against this claim or address it in the Summary Judgment Motion.

Because Petitioner failed to raise this claim on direct appeal or on state habeas review, it is both unexhausted and procedurally defaulted, and the District Court is permitted to sua sponte raise the procedural bar issue. *See Magouirk*, 144 F.3d at 359; *see also Day*, 547 U.S. at 209-11.

Regardless, even assuming Investigator Velsquez did tell Petitioner that Rodriguez would be arrested and the infants placed in protective custody, Petitioner's claim lacks merit. Although "[p]olice overreaching, mental coercion, and actual or implied promises . . . may render [a] statement obtained involuntary," *United States v. Bailey*, 468 F.2d 652, 660 (5th Cir. 1972),

Investigator Velasquez's statements, if made, did not do so. "Threats . . . to somehow burden [a defendant's loved one] until or unless the defendant confesses can raise coercion issues[,]" but "these concerns are attenuated when the family member or loved one is plausibly tied to the crime." *States v. Hall*, 711 F. App'x 198, 202 (5th Cir. 2017) (per curiam); *see also Allen v. McCotter*, 804 F.2d 1362, 1364 (5th Cir. 1986); *United States v. Hunter*, 332 F. App'x 285, 289 (6th Cir. 2009) ("Whether a threat to prosecute a third party is coercive turns on the issue of whether the threat could have been lawfully executed." (internal quotations omitted)). Here, law enforcement officials could plausibly suspect Rodriguez to be the cause of the infants' injuries. Indeed, Rodriguez was eventually convicted of a related offense and sentenced to a twenty-year term of imprisonment. Nor would it have been coercive for Investigator Velasquez to indicate that the infants would be placed in protective custody, in lieu of Rodriguez's custody, if Petitioner did not admit to causing their injuries.[17] *See, e.g., United States v. Garcia*, 2011 WL 6010296, at *5 (E.D.N.Y. Nov. 30, 2011) ("The mere fact that [a law enforcement official] told Defendant, if both he and his wife were incarcerated, then his children would have to be turned over to a responsible adult or [a state agency's protective services], does not constitute coercion.").

Likewise, Petitioner's allegations that Investigator Flores used Petitioner's lack of education and alleged low intelligence to manipulate him into making his statement do not render it involuntary. Although a defendant's education and intelligence can be used by courts to

---

[17] Even if the statements Petitioner alleges that Investigator Velasquez made were somehow coercive, this police activity appears sufficiently attenuated from Petitioner's statement to Investigator Flores. In the fruit-of-the-poisonous-tree context, the Supreme Court has identified several factors that cancel any carry-over coercive effect any prior police action might have on subsequent statements, such as "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." *See Oregon v. Elstad*, 470 U.S. 298, 310 (1985). Here, Petitioner was questioned by a different official, Investigator Flores, two days after his initial statement was given, and this subsequent interrogation took place, not at the Edinburg Children's Hospital, but at a U.S. Border Patrol station. Moreover, Investigator Velasquez was not present when Petitioner gave his statement to Investigator Flores.

determine whether a confession or statement was voluntary, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), they alone do not make a statement involuntary absent "the crucial element of police coercion," *Sosa v. Dretke*, 133 F. App'x 114, 119 (5th Cir. 2005) (quoting *Withrow v. Williams*, 507 U.S. 680, 693 (1993)).  Petitioner does not allege any such coercion on the part of Investigator Flores, and the evidence presented at trial showed that Petitioner was read his Miranda rights in Spanish, indicated that he understood these rights, and did not exercise his right to remain silent or to have an attorney present during his interrogation.  Moreover, Investigator Flores read the completed statement to Petitioner, Petitioner did not request any revisions, and he acknowledged that the statement was correct by signing it, all of which lends support to the statement's voluntariness. *See, e.g.*, *United States v. Oldman*, 156 F.Supp.2d 1252, 1264 (D. Utah 2001) (finding that defendant's acknowledgment of a statement's accuracy after it was re-read to defendant "show[ed] that [the] statement was given readily and voluntarily").

For these reasons, the Magistrate Judge concludes that Petitioner's involuntariness claim is procedurally barred, otherwise without merit, and should be denied.

**E. Actual Innocence**

Finally, raising a claim of actual innocence, Petitioner contends that the trial evidence proved he did not cause the infants' injuries. (Dkt. No. 1 at 7).

An actual innocence claim is not itself a basis for relief. *Wilkerson v. Cain*, 233 F.3d 886, 893 (5th Cir. 2000); *Foster v. Quarterman*, 466 F.3d 539, 367 (5th Cir. 2006) ("[A]ctual innocence is *not* an independently cognizable federal habeas claim.").   "Rather, it is a gateway to consideration of claims of constitutional error that otherwise would be barred from review." *United States v. Scruggs*, 691 F.3d 660, 671 (5th Cir. 2012).  In order to successfully raise actual innocence as a way to overcome a procedural bar, a petitioner must present "new reliable

evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial, and must demonstrate that it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence." *Tatum v. Stephens*, 2017 WL 5956872, at *11 (S.D. Tex. Sept. 6, 2017) (quoting *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995)) (internal quotations omitted), *report and recommendation adopted*, 2017 WL 5957747 (S.D. Tex. Nov. 30, 2017); *see also Foster*, 466 F.3d at 367.

Here, Petitioner does not identify what, if any, barred constitutional claim he wishes to address through his actual innocence claim. To the extent Petitioner wishes to address his procedurally defaulted claims, he fails to satisfy the actual innocence doctrine, beginning with his failure to present any new evidence. Instead, Petitioner states that the trial evidence established his innocence, which in this context amounts to nothing more than an improper request for a re-weighing of the evidence. *See Allen v. Frakes*, 2020 WL 5094850, at *3 (D. Neb. Aug. 28, 2020); *see also Carlisle v. Brunsman*, 2011 WL 4367996, at *10 (S.D. Ohio Jan. 14, 2011), *report and recommendation adopted*, 2011 WL 4368219 (S.D. Ohio Sept. 19, 2011).

For these reasons, the Magistrate Judge concludes that Petitioner's actual innocence claim is non-cognizable and should be denied.

## V. CONCLUSION

After review of the record and relevant law, the Magistrate Judge respectfully RECOMMENDS that the Summary Judgment Motion (Dkt. No. 10) be GRANTED, that the Petition (Dkt. No. 1) be DENIED, and that this civil action be DISMISSED.

### *Certificate of Appealability*

The Magistrate Judge must also address the matter of the issuance of a certificate of appealability ("COA").

35 / 36

A petitioner may not appeal the final order of a habeas corpus proceeding "unless a circuit justice or judge issues a [COA]." 28 U.S.C. § 2253(c)(1). Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts instructs that the District Court "must issue or deny a [COA] when it enters a final order adverse to the applicant." A petitioner is entitled to a COA when he shows that a reasonable jurist would find it debatable "whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); 28 U.S.C. § 2253(c).

Having concluded that Petitioner fails to meet this threshold, the Magistrate Judge RECOMMENDS that the District Court deny a COA.

### *Notice to the Parties*

Within fourteen (14) days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Failure to file written objections within fourteen (14) days after service shall bar an aggrieved party from de novo review by the District Court on an issue covered in this report and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of clear error or manifest injustice.

### *Directive to Clerk of Court*

The Clerk of Court is DIRECTED to forward a copy of this report to the parties by any receipted means.

DONE at McAllen, Texas this 31st day of July 2021.

J. SCOTT HACKER
United States Magistrate Judge